UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN BELZ AND KARLA BELZ | : | NO.: 3:13-CV-01315-JCH |
| | : | |
| v. | : | |
| | : | |
| PEERLESS INSURANCE COMPANY | : | JANUARY 9, 2015 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The defendant, Peerless Insurance Company ("Peerless"), hereby submits this memorandum of law in support of its motion for summary judgment.

## I. BACKGROUND AND FACTS:

This is an action for breach of an insurance contract, bad faith, and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ("CUTPA") and the Connecticut Unfair Trade Practices Act ("CUIPA"). A fourth count for stand-alone CUTPA violations was previously dismissed. The facts giving rise to this action are as follows: Peerless issued a homeowners policy, Policy Number PLP M731282 (hereinafter the "Policy"), to the plaintiffs, Stephen and Karla Belz. **Ex. A**. The Policy had effective dates of September 7, 2012 to September 7, 2013, and provided dwelling coverage limits of $321,000.

The plaintiffs initiated this action by way of summons and complaint filed September 6, 2013. In the complaint, the plaintiffs allege that they purchased the

subject property, constructed in 1984, in 2001. **Ex. E,** ¶ 4. They claim that they noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home in April of 2013. **Ex. E,** ¶ 8. However, the plaintiffs have testified and admitted in their April 23, 2014 responses to defendant's interrogatories that they noticed cracks in the property's basement walls prior to their 2001 purchase. **Ex. B**, #5, p. 3**; Ex. C**, #5, p.3**; Ex. G,** p. 26**;** and **Ex. H,** p. 13-14. The plaintiffs received and reviewed an August 20, 2001 structural evaluation report from Hugh Mullan, P.E. (**Ex. F**) and an August 23, 2001 home inspection report by L.R. Willette of Home Quality Headquarters, Inc. ("HQH") (**Ex. I**) prior to purchasing the property. Mr. Mullan's report details "numerous cracks in the foundation wall" with a "crazing pattern" and referred to the basement walls as a "retaining wall." **Ex. F** at 2. The HQH report details that "numerous apparently through cracks exist in the exposed front and side foundation walls." **Ex. I**, p. 28.

The HQH report recommended that the plaintiffs should monitor for any significant changes. **Ex. I**, pp. 12 and 28. However, the plaintiffs did not monitor for any significant changes. **Ex. G**, pp. 46-48; **Ex. H,** p. 29-30. Instead, they installed brightwall over the unfinished portion of their basement walls in 2007 to obscure the cracking damages from sight and because Mr. Belz wanted to turn the "ugly walls" into "white bright walls in the basement." **Ex. B,** pp. 3-4**; Ex. C,** pp. 3-4; **Ex. G,** pp. 29-30 and 46-48. The brightwall was supposedly removed for the first time in 2013, at which

point the plaintiffs allegedly noticed significant progression of the cracking damage. **Ex. G**, pp. 32 and 62-63; **Ex. H,** pp. 15-16 and 20.

The plaintiffs did not insure their property with Peerless until September 7, 2004. The plaintiffs have sued only Peerless for an alleged progressive and continuing collapse condition owing to an alleged deleterious chemical compound in the original concrete mix used to form the basement walls, despite pleading that a substantial impairment to their structural integrity occurred "at some point" between 1984 and April of 2013. **Ex. E,** ¶ 10-11 and 13. They alleged that the process cannot be arrested and that it was only a matter of time before the basement walls collapse, resulting in the building falling into the basement. **Ex. E,** ¶ 12 and 14-15. The Belzes did not report their claim to Peerless until May 9, 2013 (See claim notes attached as **Ex. J**, p. 7). This is in spite of their allegation that the basement walls were collapsing since construction and evidence that the pronounced cracks which are supposedly the tell-tale signs of this collapse condition were present in the basement walls and known to them prior to their 2001 purchase.

The plaintiffs have claimed that the undefined policy terms "foundation" and "retaining walls" are ambiguous and that they did not understand these terms to include their basement walls. However, the plaintiffs received and reviewed multiple reports prior to their purchase which refer to their basement walls as the "foundation" and as "retaining walls." (**Ex. F**, p. 1-2 and **Ex. I**, p. 28). Their retained experts, David

Grandpre and Dean Soucy, also use the terms “foundation” and “foundation walls” interchangeably with the term “basement walls” (**Ex. P**, p. 46; **Ex. N,** pp. 18, 23, 35, 39; **Ex. Q,** p. 71).

The plaintiffs allege that the defendant has breached its contract by not providing coverage under the Policy for the alleged loss. The extra-contractual allegations claim that the defendant has a general business practice of denying what their attorney refers to as “concrete decay” claims as part of its participation in an insurance industry-wide conspiracy (implying that causation of cracking damages in residential basements are one in the same) and that the defendant intentionally and in bad faith denied the claim based upon inapplicable policy provisions.

The Policy, as modified by its various endorsements, states in relevant part:

**SECTION I—PERILS INSURED AGAINST**

**COVERAGE A—DWELLING and COVERAGE B—OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

**1.** Involving collapse, other than as provided in Additional Coverage **8.**;

**2.** Caused by:

. . . .

**b.** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

. . . .

**(2)** Foundation, retaining wall, or bulkhead; or

. . . .

**e.** Any of the following:

**(1)** Wear and tear, marring, deterioration;

**(2)** Inherent vice, latent defect, mechanical breakdown;

**(3)** Smog, rust or other corrosion;

. . . .

**(6)** Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

. . . .

**(9)** Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

. . . .

**ADDITIONAL COVERAGES**

. . . .

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in COVERAGE C—PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage:

b. Hidden decay;

c. Hidden insect or vermin damage;

d. Weight of contents, equipment, animals or people;

e. Weight of rain which collects on a roof; or

f. Use of defective material or methods in construction, remodeling or renovation;

g. Landslide;

h. Water below the surface of the ground including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., f., g. and h. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

. . . .

**SECTION I—EXCLUSIONS**

**1.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

. . . .

**b.** **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; **. . .**

**c.** **Water Damage,** meaning:

**a.** Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

**b.** Water, or water-borne material, which:

**(1)** Backs up through sewers or drains; or
**(2)** Overflows or is discharged from a sump, sump pump or related equipment;

as a direct or indirect result of flood; or

**c.** Water, or water-borne material, below the surface of the ground, including water which:

**(1)** Exerts pressure on; or

**(2)** Seeps or leaks through;

a building, sidewalk, driveway, foundation, swimming pool, or other structure.

. . . .

e. **Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

. . . .

**2.** We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

. . . .

c. **Faulty, inadequate or defective:**

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property whether on or off the "residence premises."

. . . .

**SECTION I—CONDITIONS**

. . . .

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

   **a.** Give prompt notice to us or our agent;

   . . . .

   **d.** Protect the property from further damage. If repairs to the property are required, you must:

      **(1)** Make reasonable and necessary repairs to protect the property; and

      **(2)** Keep an accurate record of repair expenses;

. . . .

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.[1]

. . . .

**SECTIONS I AND II—CONDITIONS**

1. **Policy Period.** This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

(**Ex. A**).

. . . .

[1] The Policy was issued after the July 1, 2012 effective date of Public Act No. 12-162, which statutorily extended the suit limitations period for claims under Connecticut homeowners policies from twelve to eighteen months (Conn. Gen. Stat. § 38a-308 (b)). However, based on all of the evidence, this claimed loss occurred well before July 1, 2012.

Peerless moves for summary judgment as to all counts on the grounds that the Policy does not provide coverage for the plaintiffs' claim, it evaluated and denied the plaintiffs' claim on its own merits, and the plaintiffs' allegations of a general business practice of denying "concrete decay" claims and its participation in an insurance industry-wide conspiracy regarding its denial of their claim have no factual basis.

## II. LAW AND ARGUMENT:

### A. Standard Of Review:

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-48. A "material fact" is one whose resolution would affect the ultimate determination in the case. Id. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims… and it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings. *See* Celotex Corp., 477 U.S. at

327. "[A] plaintiff must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars." Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2nd Cir. 1970). The opposing party is entitled to the benefit of all favorable inferences which can be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987). "[T]he inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind…." NLRB v. Martin A Gleason, Inc., 534 F.2d 466, 474 (2nd Cir. 1976).

**B. There Is No Coverage For The Plaintiffs' Claim:**

**1. The undefined policy terms "foundation" and "retaining walls" are not ambiguous, but, even if they were, the extrinsic evidence conclusively demonstrates that these terms referred to the property's basement walls:**

The undefined policy terms "foundation" and "retaining wall" are not ambiguous. The plaintiffs seek coverage for their claim pursuant to the above-cited "Collapse" provision of the Policy, which excludes coverage for collapse of a foundation or retaining wall unless it is a direct result of the collapse of the building. Merely because a policy term is undefined does not render it ambiguous. "To determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary." New London County. Mutual Ins. Co. v. Zachem, 145 Conn.

App. 160 (2013). The dictionary definition of foundation is: "a usually stone or concrete structure that supports a building from underneath; . . . an underlying base or support; *especially*: the whole masonry substructure of a building". **http://www.merriam-webster.com/dictionary/foundation.**

In this Court's ruling denying the defendant's motion to dismiss it held that the terms "foundation" and "retaining wall" were ambiguous and declined to certify the determination of this debate to the Supreme Court of Connecticut. In ruling that "foundation" is ambiguous, this Court relied upon its decision in Bacewicz v. NGM Ins. Co., 2010 WL 3023882 (D.Conn. 2010), wherein it made the same finding. However, no Connecticut appellate court has addressed this issue. The sole authority cited in Bacewicz for this supposed ambiguity was the Supreme Court of Alabama's decision in Turner v. State Farm Fire and Casualty Cos., 614 So.2d 1029 (Ala. 1993). However, Turner did not quote a dictionary definition that even remotely suggested that the term "foundation" does not include the poured concrete basement walls.

Moreover, the facts in Turner are distinguishable. In Turner, the homeowners claimed that the term "foundation" would not encompass their basement walls because the walls were free standing when constructed and initially formed the interior walls of the first floor of the dwelling. Mr. Turner claimed that he subsequently filled dirt around the walls to make a basement sometime after construction. Turner, 614 So.2d at 1031. Conversely, the Belzes' basement walls were formed during the property's

construction in 1992. This Court's ruling did not indicate that these differences were considered.

The defendant disagrees with the Supreme Court of Alabama's interpretation and believes that the Supreme Court of Connecticut would conclude otherwise. The Supreme Court of Connecticut in Beach v. Middlesex Mut. Ass. Co., 205 Conn. 246 (1987)—the seminal case in this state interpreting the undefined policy term "collapse"—repeatedly referred to the basement walls as "foundation walls" and the "foundation." Thus, we believe that the Supreme Court of Connecticut will make a similar finding as that made in Wurst v. State Farm Fire and Casualty Company, 431 F.Supp.2d 501 (D. N.J. 2006); namely, that the undefined policy term "foundation" includes the basement walls. The policy at issue in Beach almost certainly did not contain the exclusion found in the Policy for loss to a foundation resulting from collapse unless the loss was a direct result of the collapse of a building.

A Massachusetts Superior Court found no ambiguity in the undefined policy terms "foundation" and "retaining walls" in Shoemaker v. Liberty Mut. Ins. Co., 17 Mass.L.Rptr. 57 (Mass. Super. Ct. 2003), wherein the plaintiffs sought recovery for the collapse of the foundation wall at the right rear underneath the attached garage. The court ruled for the insurer, citing the exclusions under the "Collapse" provision for "loss to a…foundation, retaining wall…" The Shoemakers did not argue that "foundation" or

"retaining wall" was ambiguous and the opinion made clear that any such argument would have proven unsuccessful:

> "…loss to a foundation is within a list of ancillary items to a home under the plain terms of the provision. The ancillary terms are not part of the building. As such, reading the provision to allow for insurance coverage when the collapse of the Shoemakers' 'foundation' was not caused by the collapse of the garage itself, would render the exclusionary phrase, '…unless the loss is a direct result of the collapse of a building,' meaningless." Id.

Moreover, in Beach, the Connecticut Supreme Court repeatedly referred to basement walls as retaining walls when construing homeowners policy terms. Beach, 205 Conn. at 249. Thus, even if the concrete basement walls that support the plaintiffs' home are not part of the "foundation" (which is expressly denied), they are retaining walls that prevent earth from entering the basement. Indeed, the dictionary authority cited by the plaintiffs on page 8 of their memorandum of law in opposition ("opposition") to defendant's motion to dismiss from http:dictionary.reference.com/browse/retaining+wall supports this interpretation ("a wall for holding in place a mass of earth or the like, as at the edge of a terrace or excavation"). Indeed, every dictionary the defendant has consulted supports its interpretation of retaining wall. Merriam-Webster defines retaining wall as "a wall built to resist lateral pressure other than wind pressure; *esp*: one to prevent an earth slide". http://www.merriam-webster.com/dictionary/retaining%20wall. The Oxford American English Dictionary defines retaining wall as "a wall that holds back earth or water."

http://www.oxforddictionaries.com/us/definition/american_english/retaining-wall?q=retaining+wall. The Free Dictionary by Farlex defines retaining wall as "A wall built to hold back a mass of earth or water." http://www.thefreedictionary.com/retaining+wall.

The plaintiffs cited an article for retaining wall from britannica.com on page 8 of their opposition. As an initial matter, britannica is not a dictionary. Moreover, a review of that cite reveals that anyone can create a britannica.com account and edit the article. The cited article was last edited by user "abdessamade hafoud" on July 23, 2012. http://www.britannica.com/topic/499892/history (**Ex. O**). The entire editorial history of this article is not displayed. Thus, the origin of this article's currently-displayed content may be significantly attributable to the efforts of random online users and its content is subject to change at any moment. An article which is editable by random and anonymous online users is not a credible source. This article is not instructive as to the definition of retaining wall when it is much narrower than every dictionary that the defendant has consulted and any supposed "colloquial" value it lends is dubious when its description of retaining wall differs from the term used in Mr. Mullan's report and that found in multiple appellate court decisions. See, Beach, 205 Conn. at 249; Nix v. State Farm Fire & Cas. Co., 444 Fed.Appx. 388 (11th Cir. 2011)(Collapse of retaining wall in basement of insureds' home excluded from coverage).

The purpose of a retaining wall is to hold back earth. Whether the wall is free-standing or attached to a structure, if it serves that function, it is a retaining wall. This is clearly set forth in the only credible dictionary definition the plaintiffs cited. Neither the plaintiffs nor the Court cited case law precedent which held that "retaining wall" is ambiguous. However, in its order denying the defendant's motion to dismiss, this Court wrote that "[a]mbiguous language in an insurance contract is construed against the drafter of the policy, i.e., the insurance company."

Respectfully, while this may be an accurate statement of Connecticut law upon the Court finding an ambiguity in an insurance policy for purposes of ruling on a motion to dismiss, it is overbroad. The proper standard for the ultimate resolution of a purported ambiguity in an insurance contract was set forth by the Connecticut Supreme Court in Metro Life Ins. Co. v. Aetna Cas. and Sur. Co., 255 Conn. 295, 306 (2001): "If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation....[internal citations omitted]…If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact."

The Chief Justice of the Supreme Court of Connecticut, Chase T. Rogers, recently authored a concurring opinion joined by Justice Peter T. Zarella which reinforced the holding in Metro Life :

> "…in the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured. In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted."

Connecticut Ins. Guar. Ass'n. v. Drown, 314 Conn. 161 (2014).

The Drown dissent, authored by Justice McDonald and joined by Justice Eveleigh, also noted the same principle that "because the parties both have advanced reasonable constructions, I believe we properly may consider undisputed extrinsic evidence." Drown, 314 Conn. at 209. That is four of the seven current justices of the Supreme Court of Connecticut reiterating long-standing Connecticut law. See also, Connecticut Ins. Guar. Ass'n. v. Fontaine, 278 Conn. 779, 788 (2006)("Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although if the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact….[internal citations omitted]…The present case is, however, before both the trial court and this court on a statement of stipulated facts, and, accordingly, the language falls into the category of ambiguities 'that cannot be resolved by examining the parties' intentions.").

While the defendant disagrees with this Court's ruling that the terms "foundation" and "retaining walls" are ambiguous and maintains that there is sufficient reason to believe the Supreme Court of Connecticut would hold differently, it respects this Court's determination. However, ultimately the trier of fact—which will be the jury should this matter proceed to trial—will determine whether it can resolve the supposed ambiguities and reach the mutual intent of the parties as to these terms upon consideration of the extrinsic evidence. Only if it cannot will any ambiguities be construed against the defendant.

When the extrinsic evidence is considered in this matter, it is clear that no reasonable jury could resolve the purported ambiguities in the Belzes' favor. The plaintiffs had a home inspection performed prior to the purchase of the subject property by HQH. **Ex. B**, p. 3**; Ex. C,** p. 3. They also indicated that they "…had raised some concerns about the presence of cracking in the basement walls of the home as we prepared to purchase the property. As a result, the prior owner consulted with Hugh Mullan, P.E., PO Box 1198, Glastonbury, Connecticut 06033. Mr. Mullan inspected the property and issued a report finding that the home was structurally sound. We were provided with this report as part of the purchase of our home." **Ex. B**, p. 3 and **Ex. C** at p. 3. The plaintiffs produced HQH's report (**Ex. I**) and Mr. Mullan's report (**Ex. F**) during discovery and testified that they had previously seen and reviewed these reports prior to purchasing their property (**Ex. G**, p. 23-24 and **Ex. H**,

pp. 12-13). Mrs. Belz also testified that the plaintiffs had never previously retained a structural engineer to inspect a residence they were purchasing (**Ex. H**, p. 66-67).

The first paragraph of Mr. Mullan's report indicates that "the primary purpose of the inspection and this report is to evaluate the cracks in the foundation walls." In the second paragraph he again refers to the basement walls as "foundation walls." In the first paragraph of the second page of his report, he again refers to the basement walls as "foundation walls." In the second paragraph of the second page of his report, Mr. Mullan twice refers to the basement walls as a "foundation walls" and notes that they function as a "retaining wall." In that paragraph, he uses the terms "foundation walls", "retaining wall" and "basement walls" interchangeably. In the fourth and fifth paragraph of the second page of his report, Mr. Mullan again refers to the basement walls as the foundation walls" and the "foundation." **Ex. F**.

The HQH report is also replete with references to the basement walls as the "foundation walls" (**Ex. I**, pp. 12-13, 28) and foundation (**Ex. I**, pp. 12-13). The plaintiffs have testified that they received and reviewed these reports prior to purchasing their property. If the Belzes reviewed the Policy they would have noticed that the terms "retaining wall" and "foundation" were excluded under the collapse provision unless the loss was a direct result of the collapse of the building. Peerless has expressed no confusion as to the meaning of these terms. The Policy was never intended to insure the collapse of basement walls unless it was the direct result of the

collapse of the building, as the basement walls are the foundation and are retaining walls (Transcript of 30 (b) (6) Deposition of Michael Piacente, pp. 62, 102, 162, attached as **Exhibit V**). These terms are not ambiguous and are used in the Policy as they are in their normal everyday parlance.

The above-cited reports, case law, and the dictionary definitions cited by the defendant (and even the plaintiff in regard to the term “retaining wall”) reveal that the terms “foundation” and “retaining wall” are universally understood not only by laypeople, but also by those in the engineering and home-building industries, including the plaintiffs’ own experts, Mr. Grandpre and Mr. Soucy. As previously noted, Mr. Grandpre has testified that the terms “foundation walls”, “foundation”, and “basement walls” are used interchangeably. (**Ex. Q**, p. 71). This Court also made note of this in the Bacewicz litigation. Bacewicz, 2010 WL 3023882 at 4.

There was a time not long ago when the plaintiffs’ attorney did not consider the term “foundation” ambiguous. In Parker v. Worcester Ins. Co., 247 F.3d 1 (1st. Cir. 2001), he brought suit to recover for the “collapse” of his basement walls. The policy contained an identical collapse provision. The argument that “foundation” and “retaining wall” were ambiguous was not made through the time of appeal, despite eleven references in the opinion to the basement walls as either the “foundation” or “foundation walls.” However, the Court noted that “…lawyers are inventive in finding ambiguities to construe against the insurer…we think it is fair to point out the apparent

difficulties..." Parker, 247 F.3d at 6. Thus, the First Circuit did not consider "foundation" to be ambiguous. However, it accurately forecasted what lie ahead—lawyers inventing ambiguities where none otherwise exist.

The plaintiffs have developed a clever argument to attempt to procure coverage for the cracking to their foundation. However, clever arguments do not override the mutual intent of the parties when entering into a contract. The terms "foundation" and "retaining wall" are not ambiguous. However, even if they were, the extrinsic evidence reveals that these terms were understood by both parties to refer to the property's basement walls. No reasonable jury could conclude otherwise.

**2. The plaintiffs' claim is barred by the Policy's Policy Period and Suit Against Us Conditions:**

The plaintiffs' claim is barred by the Policy's Policy Period and Suit Against Us provisions. Peerless insured the property from September 7, 2004 through September 7, 2013. The Policy Period provision, cited supra, indicates that the Policy only applies to property damage which occurs during the policy period. The plaintiffs cannot substantiate that the claimed damages occurred while Peerless was on the risk.

The plaintiffs have no photographs of their basement walls which predate 2013 (**Ex. B**, p. 8 and **Ex. C,** p. 8; **Ex. G**, p. 76; **Ex. H,** p. 49). Mr. Mullan's 2001 report notes "numerous cracks in the foundation wall" and refers to the "crazing pattern of the cracks." (**Ex. F,** p. 2). The 2001 HQH report notes that "numerous apparently through

cracks exist in the exposed front and side foundation walls." (**Ex. I**, p. 28). Thus, the cracking damages predated their ownership of the property. There is no credible evidence of a progression of damage in the basement walls from 2001 through 2013. Thus, if there was a "collapse" of the basement walls in that they suffered a substantial impairment to their structural integrity, it occurred *prior* to the plaintiffs' 2001 purchase and well before the defendant's initial Policy in September of 2004.

The plaintiffs' engineer agrees that any substantial impairment to structural integrity occurred prior to Peerless' initial Policy. Mr. Grandpre prepared an affidavit in a supposedly related matter currently pending in Connecticut Superior Court, Boucher v. Amica Mutual Insurance Company*,* Docket No: TTD-CV-12-6004826-S*.* (**Ex. R**). In that matter, Mr. Grandpre swore that he was informed the property was constructed in 1986 (**Ex. R, ¶ 4**) and indicated that the basement walls in that matter would have ceased being a solid mass as they were intended sometime in the early 2000s (**Ex. R,** ¶ 38). He testified that his definition of "sometime in the early 2000s" is sometime between the years 2000 and 2004 (**Ex. Q,** p. 48). Thus, according to Mr. Grandpre's sworn testimony, the basement walls at the Belzes' property would have suffered a substantial impairment in their structural integrity to the point that they would have ceased being a solid mass sometime between fourteen-to-eighteen years after pour.

Moreover, Mr. Grandpre testified that the Boucher property was on a different timeline in terms of deterioration than the plaintiffs' basement walls in that the severity

of the damage to the Belzes' walls was much more significant and progressing more rapidly. (**Ex. P,** p. 36). The plaintiffs pled that their property was constructed in 1984. Thus, according to Mr. Grandpre's timeline the "collapse" would have occurred, at the latest, sometime between 1998 and 2002. As Peerless did not insure the subject risk until September of 2004, the plaintiffs' claim is barred by the Policy's Policy Period and Suit Against Us provisions.

The plaintiffs will undoubtedly argue that even if the loss predated Peerless' initial Policy that they did not know the severity of the problem and did not have reason to know of it. However, this argument cannot be utilized to shift onto a subsequent insurer liability for a claim which predated its initial Policy. The plaintiffs were sufficiently concerned about the cracking damages in their basement walls that they insisted that a structural engineer evaluate the cracking damages in 2001. **Ex. H,** p. 14. The through cracks existed in 2001 and the Belzes were notified of same in the HQH report. **Ex. I**, p. 28.

Mr. Grandpre testified that while he has no knowledge as to the precise nature of the chemical reaction allegedly unfolding within the basement walls, the reactions he's familiar with which could cause the observed damage are alkali-silica reaction ("ASR") and iron sulfide oxidation. **Ex. P.** p. 24. Mr. Grandpre is not a chemist or concrete petrographer. Moreover, alkali-sicila reaction is not a recently-discovered phenomenon. <u>East Mississippi Elec. Power Ass'n v. Porcelain Products Co. (Inc.)</u>,

757 F.Supp. 748 (S.D. Miss 1990); In re Lone State Industries, Inc. v. LaFargo Corp., 882 F.Supp. 482 (D.Md. 1995); Fisher Sand & Gravel Co. v. State By and Through South Dakota Dept. of Transp., 558 N.W.2d 864 (S.D. 1997). Thus, if recognition and diagnoses of these conditions is within the competence and knowledge of a professional engineer who is not a chemist or concrete petrographer and who has performed no scientific tests on the concrete (which we deny) then Mr. Mullan should have possessed this knowledge in 2001. Peerless is not a warrantor of Mr. Mullan's evaluation which predated its initial Policy by over three years.

Further, the Supreme Court of Connecticut has ruled that a suit limitations provision in a policy requiring suit to be brought within a specified time is a valid contractual provision and that failure to comply therewith is a defense to an action on the policy. Monteiro v. American Home. Assur. Co., 177 Conn. 281 (1979).

In furtherance of its recognition of the validity and enforceability of suit limitations periods in insurance policies, the Supreme Court of Connecticut stated:

> [L]imitation periods on suits are designed to promote justice by preventing surprises through revival of stale claims, to protect defendants and courts from handling matters in which the search for truth may be impaired by loss of evidence, to encourage plaintiffs to use reasonable and proper diligence in enforcing their rights, and to prevent fraud.

Voris v. Middlesex Mut. Assur. Co., 297 Conn. 589 (2010).

Any claimed loss occurred long before July 1, 2012. Thus, the plaintiffs had twelve months after the date of loss to file suit. The plaintiffs failed to do so, despite

knowledge and notice of through cracks predating their 2001 purchase. Thus, their claim is barred by the Policy's Policy Period and Suit Against Us provisions.

**3. The claim is barred by the plaintiffs' neglect, failure to give prompt notice, and failure to protect the property from further damage:**

There is no coverage for the claim. However, even if the supposed "collapse" occurred during a Peerless Policy, the claim is barred due to the Belzes' neglect to use all reasonable means to save and preserve their property to Peerless' extreme prejudice. A failure to mitigate damage from an otherwise covered loss precludes coverage under the Policy. See Fetzer v. Safeco Ins. Co., 2007 WL 4634728 (Conn.Super. 2007); Catalano v. State Farm Ins. Cas. Co., 2007 WL295321 (W.D.N.Y. 2007); 40 Gardenville, LLC v Travelers Property Casualty of America, 387 F.Supp.2d 205 (W.D.N.Y. 2005).

The HQH report noted that "numerous apparently through cracks exist in the exposed front and side foundation walls" and warned that "[t]hese cracks may allow water seepage." The report recommended that the plaintiffs monitor for any significant changes. **Ex. I**, p. 28. However, the plaintiffs did not monitor for any significant changes. **Ex. G**, p.p. 46-48 and **Ex. H,** p. 29-30. Mr. Belz was dismissive of his responsibility to monitor the cracks and did not think that a homeowner should have to monitor their basement walls for progressive cracking damages. **Ex. G,** p. 49-50. Instead, the plaintiffs installed brightwall over the unfinished portion of their basement

walls in 2007 to obscure the cracking damages from sight and because Mr. Belz wanted to turn the "ugly walls" into "white bright walls in the basement." **Ex. B**, pp. 3-4; **Ex. C,** pp. 3-4; and **Ex. G,** pp. 29-30 and 46-48.

The brightwall was supposedly removed for the first time in 2013, at which point the plaintiffs allegedly noticed significant progression of the cracking damage. **Ex. G**, pp. 32 and 62-63 and **Ex. H,** pp. 15-16 and 20. The plaintiffs have no photographs which document the supposed progression. Moreover, according to Mr. Grandpre, the brightwall accelerated the progression of damages, as the brightwall affixed to the basement walls acted as a vapor barrier which trapped water within the concrete walls and did not allow the drying or evaporation process to take place. **Ex. P**, pp. 36-37.

The Belzes' neglect was more egregious than the Fetzers' neglect which resulted in their otherwise covered loss being properly denied because it resulted from their own neglect. The Fetzers noticed that their garage roof had been leaking since the Fall of 2000. In response, Mr. Fetzer installed a tarp and performed minor repairs. He replaced the tarp in the Fall of 2002 and the loss occurred in February 2003. Fetzer, 2007 WL 4634728 at 1. Conversely, the Belzes consciously obscured noted through cracks they were advised to monitor for significant changes and informed could cause water seepage because Mr. Belz thought they were ugly and he likes his walls "nice and neat." **Ex. G**, p. 29.

An insurer has no duty to insure for damages which existed well before the Policy, which were known to the homeowner, and which allegedly progressed due to their willful blindness and elevation of the beautification of their property over the interests of its structural integrity. The plaintiffs neglected to take even minimal means to save and preserve their property or protect it from further damage.

In paragraph 12 of their complaint, the plaintiffs allege that there is no known process which is effective in curbing the advancement of the alleged chemical reaction occurring within their basement walls and that it will continue to advance with or without the presence of visible water. However, the plaintiffs have not disclosed an expert who is qualified to reach these conclusions or opine about chemical processes within concrete. Conversely, the defendants disclosed Nick J. Scaglione, President of Concrete Research & Testing, LLC. Mr. Scaglione is a concrete petrographer and has almost thirty years of experience in petrography and concrete research science and testing. **Ex. U**, pp. 4-6. Mr. Scaglione has opined that:

> "Although it is not possible to reverse the deterioration of either ASR distress or distress related to the oxidation of iron sulfide materials, the distress can be arrested by cutting off the source of water to the concrete. It is well known in the industry that ASR reactive aggregates that cause significant distress when used in exterior concrete structures exposed to the elements, will not cause distress when used for interior concrete structures not exposed to moisture." **Ex. U**, p. 2.

Mr. Scaglione refutes Mr. Grandpre's conclusion that if the observed distress in the basement walls was related to either ASR or the oxidation of iron sulfide minerals

within the aggregate that the observed distress could occur in relation to the initial mix water or ambient moisture. Mr. Scaglione has opined that for the cracking distress to have reached the observed levels, a long-term exposure to an exterior source of water was necessary. **Ex. U,** pp. 1-2. He further noted that almost all homes constructed today contain a waterproof membrane on the exterior surface of the below-grade concrete in order to protect against exterior water infiltration. **Ex. U**, p. 2. The Belzes made no attempts to waterproof their basement walls to protect against water infiltration. **Ex. G**, p. 42 and **Ex. H**, p. 27. Their concern lied with the aesthetic appearance of their basement walls, not with their structural integrity, and, according to Mr. Grandpre, this overriding concern accelerated the damage.

Based on the expert qualifications and the evidence, the only conclusion a reasonable jury could reach is that a long-term exposure to an exterior source of water is necessary to cause the observed damage if it is related to either ASR or the oxidation of iron sulfide. As discussed above, if the observed distress is related to ASR or oxidation and if the damages progressed during Peerless' Policy the plaintiffs would not have known about it because they were willfully blind of the condition of their basement walls and their actions in the furtherance of beautifying their property accelerated the progression of damage. The Belzes neglected to protect their property from damage (an exclusion under the Policy), which also resulted in a flagrant

violation of their Duties After Loss to give prompt notice of a loss and to protect the property from further damage.

An insurer bears the burden of proving by a preponderance of evidence that it has been prejudiced by an insured's failure to comply with a notice provision. Arrowood Indem. Co. v. King, 304 Conn. 179 (2012). The defendant meets this burden. As discussed, if there was a progression of the cracking damage in the basement walls during the time in which Peerless insured the property—and the plaintiffs have testified that there was between 2007 and 2013 and that it was significant—then the plaintiffs would have known about this and been able to timely notify Peerless had they followed HQH's advice to monitor for changes, had they heeded HQH's warning that the cracks may allow water seepage, and had they not covered the basement walls with brightwall. According to Mr. Scaglione, if the damage is due to ASR or iron sulfide oxidation, it could have been curbed if the long-term exposure to exterior water infiltration was remedied. The plaintiffs' actions resulted in their violation of the Policy's notice provision to Peerless' extreme prejudice. An insured has a duty to give notice as soon as can reasonably be expected under the circumstances. Arrowood, 304 Conn. at 199. The Belzes failed to do this.

The plaintiffs did not inform Peerless of cracks in their basement walls until May 9, 2013. There is no credible evidence to substantiate that the cracks were any different on May 9, 2013 than those documented in 2001. Thus, if any "collapse"

occurred it transpired prior to the initial Policy. However, even if it occurred during Peerless' Policy then the Belzes' willful blindness, neglect, failure to give prompt notice, and failure to protect the property from further damage caused the damages to reach the point wherein the basement walls suffered a substantial impairment to their structural integrity.

**4. The plaintiffs intentionally spoliated evidence essential to the defense:**

"Spoliation is the destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776 (2d. Cir. 1999). Even sans a discovery order, a district court may impose sanctions for spoliation by exercising its inherent power to control litigation. The sanction should be designed to deter the parties from engaging in spoliation, place the risk of an erroneous judgment on the party who wrongfully created the risk, and restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party. West, 167 at 779. While outright dismissal of an action due to spoliation is within the court's discretion, it is only imposed in extreme circumstances. More commonly, the sanctions are instructions to the jury regarding presumptions favorable to the aggrieved party, and preclusion of the spoliating party from introducing evidence on the issues spoliated. Id. at 780.

The plaintiffs removed and replaced their basement walls in the fall of 2013. **Ex. N**, p. 34. They did not give Peerless notice of their replacement. **Ex. G**, pp. 82-83 and **Ex. H,** p. 62. Summons was not issued until September 9, 2013. As detailed below, the plaintiffs never notified Peerless of their "collapse" claim until the complaint was served. The walls were standing and supporting their house at the time of their 2013 replacement. While the plaintiffs will undoubtedly claim that imminent replacement was necessary due to the condition of their walls, there is not, to the defendant's knowledge, a single instance of a basement wall actually collapsing in any of these self-termed "concrete decay" claims brought by the plaintiffs' attorneys. Even if there were, however, it would not excuse the plaintiffs' failure to notify Peerless of the replacement of the basement walls in the fall of 2013 until their April 23, 2014 responses to the defendant's interrogatories. **Ex. B**, pp. 5-6 and **Ex. C**, pp. 5-6.

The plaintiffs' actions spoliated evidence and prejudiced the defendant's ability to defend this case. Mr. Scaglione was unable to perform a petrographic examination of core samples from the concrete basement walls and will testify that confirmation of either ASR or iron sulfide oxidation cannot be done via visual inspection. **Ex. U**, p. 1. Mr. Belz testified that the remnants of his removed basement walls were buried in his yard and that the defendant can "go dig" to find them **Ex. G**, pp. 87-88. There is no way to prove that any concrete which may be buried in his yard is from his basement walls and the defendant is not going to "go dig" to find this concrete. The replacement

of the basement walls without notice comports with the Belzes' usual refusal to conduct themselves in good faith as a party to an insurance contract.

In light of the plaintiffs' actions, the defendant is, at a minimum, entitled to the presumption that there was no deleterious compound present within the plaintiffs' concrete basement walls and that the plaintiffs intentionally destroyed evidence to impede the defense of this action. Assuming such a presumption is granted, all of the evidence indicates that the extent of damages claimed were present in 2001.

The plaintiffs claim that the concrete used to form their foundation walls was "most likely" provided by J.J. Mottes Company ("Mottes"). However, there is nothing to substantiate this claim. There is significant equity in claiming that the concrete was supplied by Mottes, as there were prior suits against Mottes regarding its allegedly defective concrete. Tofolowsky v. Bilow, 2003 WL 1475141 (Conn. Super. 2003). The plaintiffs' claim that the concrete was "most likely" provided by Mottes unfairly legitimizes that any problem with their concrete will develop similarly to those at other properties which had basements constructed with Mottes concrete and provides support for their assertion that there is a common linkage between cracking observed in their basement walls and those of the dozens of other plaintiffs represented by their attorneys in pending lawsuits with identical allegations. The plaintiffs have sworn that they had no documents which indicate that the concrete at the premises was from Mottes. **Ex. B**, p.14 and **Ex. C,** p. 14**.** Thus, they are not entitled to this inference.

In light of the above discussion, the plaintiffs' claim is excluded from coverage by all of the Policy provisions cited and/or briefed, supra.

**C. No reasonable jury could conclude that the defendant acted in bad faith:**

The standard for bad faith is well-established: "Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." *Buckman v. People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987).

Moreover, the Supreme Court of Connecticut recently held that absent a wrongful denial of a benefit under the Policy, there can be no action for bad faith. Capstone Building Corp. v. American Motorists Ins. Co., 308 Conn. 760, 794-98, 67 A.3d 961 (2013). Thus, the defendant is entitled to summary judgment on Count II if this Court rules in the defendant's favor as to the plaintiffs' breach of contract count.

The plaintiffs' bad faith count is seemingly brought only to "up the ante" in this litigation. Courts in Connecticut are well-aware of this frequent and unfortunate practice in first-party actions:

> "…[F]irst-party actions against insurers…are increasingly accompanied by bad faith claims and CUTPA/CUIPA actions. Not infrequently, these additional claims are themselves brought in bad faith, to 'up the ante' at pretrial and trial by increasing the insurer's exposure; to exponentially increase the scope of discovery, with the hope of obtaining the insurer's entire file, including its work-product investigation; and for purposes of trial strategy. In such case, the prejudice to the defendant is evident."
>
> Khanthavong v. Allstate Ins. Co., 1996 WL 704366 (Conn. Super 1996).

The evidence and testimony reveal that the plaintiffs never made a "concrete decay" or "collapse" claim to the defendant. Claim notes reveal that Mr. Belz reported the claim to Peerless on May 9, 2013. **Ex. J,** p.7. According to claims notes, Mr. Belz reported that the "basement wall is bowing and floor above creakin[g] and chimney is pulling away from home. Insured states wall is so bad that he can put his finger thru wall." **Ex. J,** p. 7. However, the HQH report referencing through cracks demonstrates that Mr. Belz could do this in 2001 as well. **Ex. I,** p. 28.

Mr. Belz testified that he didn't report the claim to Peerless and instead reported it to his agent. **Ex. G,** p. 64. However, the claim file and claim notes are bereft of any mention of his agent reporting the claim. The claims notes indicate that Mr. Belz reported the loss and an e-mail from Peerless to Mr. Belz confirming their conversation supports that Mr. Belz reported the loss. **Ex. J**, p.7, and **Ex R**. In any event, Mr. Belz testified that he "doubted" that he mentioned to his agent that the concrete for his basement walls was supplied by Mottes, denied that he reported that the damage had progressed over time, did not remember whether he mentioned that the basement

walls were collapsing, and did not think he reported that his claim was similar to those of other homes in the area **Ex. G,** pp. 64-65. There is no mention in the claim notes or claim file of Mottes concrete, a progressive collapse condition, other "concrete decay" claims, or a common problem occurring in the Belzes' basement walls which was similarly afflicting numerous properties in the vicinity of their property.

In response to the Belzes' claim, Peerless retained a professional engineer, Robert Monaco, from the nationally-recognized firm, Peter Vallas Associates, Inc. Mr. Monaco inspected the property on May 18, 2013 and authored a report on May 21, 2013. Mr. Monaco opined that "[b]ased on observations made and conversations with the homeowner, it is my understanding that separation of the chimney has nothing to do with the problems noted at the concrete foundation level…" **Ex. L**, p. 2. Mr. Monaco further opined that "…there is no reason to assume that the cracks compromise structural integrity of the approximately 8 inch wide concrete foundations…" **Ex. L,** p. 3. Mr. Monaco incorporated into his report Mr. Mullan's 2001 report which referenced the same damage. **Ex. L**, pp. 12-13.

Following review of Mr. Monaco's report, Peerless issued a May 29, 2013 letter denying the plaintiffs' claim. **Ex. M**. Based upon the claim presented to it, Peerless is dumbfounded as to how the plaintiffs believe it acted in bad faith in denying their claim. It received a claim for cracking damage to a foundation, it instantly dispatched a

professional engineer to inspect it, and it relied upon his professional opinion in reaching its claim determination.

The plaintiffs have proffered no evidence for why Peerless should have considered the "collapse" provision of the Policy when evaluating the claim. A collapse was not reported. It had a report from its retained professional engineer that the foundation was structurally sound. Further, even if it would have considered the "collapse" provision, it would have noted that loss to a "foundation" or "retaining wall" is not covered unless it is a direct result of the collapse of a building. **Ex. A,** p. 5 of 18. This Court found the defendant's interpretation of these terms entirely reasonable in this litigation and in Karas v. Liberty Ins. Corp, 2014 WL 3579524 (D. Conn. 2014).

Moreover, the plaintiffs' attorneys do not know which insurer is liable under their collapse theory. This is demonstrated by their suit against the prior insurer, Amica Mutual Insurance Company, in the Roberts matter (Roberts v. Amica Mutual Ins. Co., Civil Action No.: 3-14-cv-01589 (VLB)) after initially suing the present insurer, Liberty Mutual Fire Insurance Company, for the identical loss, and their stated intention to bring the prior insurer, Allstate Insurance Company, into a "concrete decay" lawsuit pending before this Court while allowing that "Liberty Mutual would only need to cover the loss if it occurred during the time that Liberty Mutual insured the property." (Metsack v. Liberty Mutual Fire Ins. Co., Civil Action No: 3:14-CV-01150-VLB, Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss, p. 13,

attached as **Exhibit W**). The plaintiffs cannot credibly allege that the defendant acted in bad faith in denying their claim when their attorneys are unsure which insurer they theorize is liable for covering it

Mr. Grandpre visited the plaintiffs' property on June 24, 2013 at Attorney Parker's request in order to conduct an engineering evaluation of the basement walls. **Ex. S**, p. 1. Thus, both the attorney and his engineer of choice in these self-termed "concrete decay" cases were involved within a month of claim denial (at the latest) and well before suit was filed in September of 2013. However, Peerless was never informed of this "collapse" claim, about the supposed problems with Mottes concrete, or about supposedly similarly afflicted properties prior to suit. Instead of providing Peerless with all pertinent information, the Belzes initiated suit based upon a claim which was never presented to their insurer. Based on the evidence and testimony, no reasonable jury could conclude that Peerless handled this claim in bad faith. As such, summary judgment should be entered on the defendant's behalf as to Count II.

**D. The plaintiffs' CUTPA/CUIPA count is meritless:**

The plaintiffs' CUTPA/CUIPA count is similarly meritless for all of the reasons detailed in the preceding subsection concerning the bad faith count. The plaintiffs' CUTPA/CUIPA claim details a lack of understanding of the Insurance Service Office, Inc. ("ISO") and its relationship with the defendant. Peerless did not have knowledge of the Bacewicz matter during its claim evaluation and did not consider the outcome of

that litigation in reaching its coverage determination. This is confirmed by the lack of any mention of ISO or the Bacewicz case in the claim file and claims notes. There is also no mention of any other claims in the claim notes or claim file. Ms. Cestone's denial letter and the absence of references to other claims clearly establishes that Peerless evaluated this claim on its own merits and without consideration given to any other claim. **Ex. M.**

Moreover, the plaintiffs' allegation in paragraph 45 of the complaint that Peerless obtained knowledge from ISO of other insurers' attempts to deny coverage in these self-termed "concrete decay" claims is similarly unfounded. The listed excluded causes in that paragraph are commonly applicable policy exclusions that no insurer would have to rely upon ISO to provide. Again, there are no indications in the claim file or claim notes that any information was provided by ISO in relation to this claim. Moreover, Mr. Soucy testified in the Roberts matter that foundation walls break for a number of reasons. **Ex. T,** pp. 47 and 71. Thus, Mr. Soucy's testimony supports the defendant's contention that there was no reason to link this claim to any other claim. Peerless' policies utilize ISO forms. ISO does not provide it with information about "concrete decay" claims or the prevalence of them in northeastern Connecticut.

In order to prevail under CUTPA/CUIPA, the plaintiffs must plead and prove that the defendant engaged in a general business practice of unfair claims handling practices. *Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 847-49, 643 A.2d 1282 (1994).

As noted above, the defendant had no reason to link this case to its claims handling decisions in the other matters cited in the complaint, particularly Waters, a 2006 claim in another state. The plaintiffs have no evidence that other claims were considered or relied upon by Peerless during its claim evaluation. All they have to support their CUTPA/CUIPA claim is that their attorneys have brought multiple identical lawsuits relatively contemporaneously, which is not sufficient to support a CUTPA/CUIPA violation. The only questionable general business practice at issue is the plaintiffs and their attorneys' other "concrete decay" clients concealing their actual claim until litigation, ostensibly for the purpose of upping the ante of litigation in the hopes of exponentially increasing the defendant's exposure and the scope of discovery.

The plaintiffs' CUTPA/CUIPA claim is premised solely on the alleged unfair denial of coverage for the plaintiffs' "collapse" claim. Thus, there can be no violation of CUTPA/CUIPA unless it is first established that both the underlying claim is covered and was presented to the insurer. Since the underlying "collapse" claim is not covered and was never presented to the defendant during the claims process, the denial of coverage based upon the claim made is not a violation of CUTPA/CUIPA.

## III. CONCLUSION:

For the foregoing reasons, it is respectfully requested that the motion for summary judgment be granted as to all remaining counts.

DEFENDANT,
PEERLESS INSURANCE COMPANY

By____/s/ Kieran W. Leary_______
Philip T. Newbury, Jr. (ct05283)
Kieran W. Leary (ct29484)
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
(860) 249-7665 (Fax)
E-Mail: pnewbury@hl-law.com
E-Mail: kleary@hl-law.com

## CERTIFICATION

This is to certify that on January 9, 2015, a copy of the foregoing **Memorandum of Law in Support of Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Michael D. Parker, Esquire
Jeffrey R. Lindequist, Esquire
One Monarch Place
Suite 2220
Springfield, MA 01144
**(413) 736-4101**
**(413) 736-4582 fax**
**mparker@mdparkerlaw.com**
**jlindequist@mdparkerlaw.com**

____/s/ Kieran W. Leary_________
Kieran W. Leary