**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHEN BELZ and KARLA BELZ : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | No. 3:13-cv-01315 (VAB) |
| : | |
| PEERLESS INSURANCE COMPANY : | |
| : | |
| Defendant : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case arises out of an insurance dispute between Plaintiffs Steven and Karla Belz (the "Belzes") and Defendant Peerless Insurance Company ("Peerless"). The Belzes experienced significant damage to their basement walls in the form of widespread cracking that threatened to compromise the structural integrity of their home. The Belzes filed an insurance claim with Peerless under the applicable homeowner's insurance policy with respect to the cracks in the basement walls, and Peerless denied coverage. Less than five months after the denial, the Belzes initiated this action.

The Belzes have stated three claims against Peerless: (1) a breach of contract claim under the terms of the applicable homeowner's insurance policy; (2) a breach of the implied covenant of good faith and fair dealing; and (3) a violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). In January 2015, Peerless filed a motion for summary judgment with respect to all three of the Belzes' remaining claims. For the reasons stated below, Peerless' Motion for Summary Judgment is **DENIED**.

**I. STATEMENT OF FACTS**

The Belzes purchased their home in Vernon, Connecticut in 2001. In advance of the purchase in 2001, the Belzes were made aware of notable cracking in the basement walls through an initial home inspection report prepared by Home Quality Headquarters, Inc. ("HQH Report"). L.R. 56(a)(1) ¶ 17, ECF No. 53; L.R. 56(a)(2) ¶ 17, ECF No. 61. The HQH Report mentioned numerous cracks in the basement walls and recommended "monitoring for any significant changes." *Id.* at ¶ 18. Before finalizing the purchase of the home, the Belzes hired an engineer, Hugh Mullan, P.E., to conduct an independent evaluation of the cracking in the basement walls. *Id.* at ¶ 6-8. In a report dated August 2001, Mr. Mullan ultimately concluded that the cracks did not threaten the structural integrity of the home. L.R. 56(a)(2) at 23; Mullan Rep. 2, ECF No. 53-6 (Exh. F). The Belzes began purchasing homeowner's insurance through Peerless, a member of the Liberty Mutual Group, in September 2004. L.R. 56(a)(1) ¶ 3; L.R. 56(a)(2) ¶ 3.

In 2007, the Belzes installed "brightwall" wall panels in their basement to cover the cracks in the walls. Although there is no photographic evidence of the condition of the basement walls at the time of the brightwall installation, the Belzes insist that the cracks were no more severe in 2007 than they were in 2001 when the home was initially purchased. L.R. 56(a)(2) at 23. The Belzes further explain that they understood the cracks to be a cosmetic problem rather than a structural threat to the home, and that they chose to install the brightwall because it "made the ugly walls turn into white bright walls in the basement." Dep. of Stephen Belz 30, ECF No. 53-7 (Exh. G). After the brightwall was installed, the cracks were no longer visible, and the cracks continued to be obscured from view until the brightwall was removed in or around April of 2013. As soon as the Belzes removed the brightwall in 2013, they discovered that the cracking had progressed substantially, to the point where the gaps in the wall were so big that

Mr. Belz could reportedly put his finger through the wall. *Id*. at 55; Peerless Claims Notes 4, 7, ECF No. 53-10 (Exh. J).

On May 9, 2013, the Belzes filed an insurance claim with Peerless with respect to the cracks in the basement walls. The insurance policy in place at that time states the following:

> 8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
>    a. Perils Insured Against in COVERAGE C – PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;
>    b. Hidden decay;
>    c. Hidden insect or vermin damage;
>    d. Weight of contents, equipment, animals or people;
>    e. Weight of rain which collects on a roof; or
>    f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Homeowner's Insurance Contract 58, ECF No. 53-1 (Exh. A). The term "collapse" is not explicitly defined in the contract.

Within the same "Collapse" provision, the insurance policy also excludes the following from coverage:

> Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items **b.**, **c.**, **d.**, **e.**, and **f.** unless the loss is a direct result of the collapse of a building.

*Id*. The terms "foundation" and "retaining walls" are not explicitly defined in the contract. Additional exclusions are listed under "SECTION I - EXCLUSIONS," which states in relevant part:

> 2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

3

> … c. Faulty, inadequate or defective: (1) Planning, zoning, development, surveying, siting; (2) Design, specifications, workmanship, re- pair, construction, renovation, remodeling, grading, compaction; (3) Materials used in repair, construction, renovation or remodeling; or (4) Maintenance; of part or all of any property whether on or off the "residence premises."

*Id*. at 62.

On May 29, 2013, Peerless denied the Belzes' claim, citing "poor workmanship and materials used" as its basis for denial. Peerless Denial Letter 1, ECF No. 53-13 (Exh. M). Shortly after the denial, the Belzes had the cracks inspected by another engineer named David Grandpré, who reported that the basement walls were substantially structurally impaired and would need to be replaced to avoid a complete collapse. Grandpré Report 4, ECF No. 53-19 (Exh. S). Mr. Grandpré further concluded that the cracking was likely caused by a chemical reaction within the concrete mix itself, which according to Mr. Grandpré is commonly found in defective concrete supplied by a concrete company named Joseph J. Mottes ("J.J. Mottes") Company in Stafford Springs, Connecticut. *Id*. at 2. The Belzes subsequently had their basement walls replaced in their entirety, and they initiated this lawsuit against Peerless in September of 2013.

## II. STANDARD OF REVIEW

The Court shall grant summary judgment, if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record." *See* Fed. R. Civ. P. 56(c)(1)(A)-(B); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). A factual dispute is "'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and material if the substantive law governing the case identifies those facts as material. *Williams*

*v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir. 1998)); *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing a summary judgment motion, the Court must resolve all ambiguities and draw all inferences from the record as a whole in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).

## I. DISCUSSION

Peerless disputes all three of the Belzes' surviving claims. Peerless asserts that its decision to deny the Belzes' insurance claim does not constitute a breach of the insurance contract between the parties. In support of this argument, Peerless claims that (a) the terms of the insurance contract are unambiguous and do not provide coverage for the Belzes' claim; (b) the timing of the claimed loss precludes recovery; and (c) the Belzes' own neglect and failure to mitigate further damage precludes recovery under the terms of the contract. Peerless also argues that the Belzes intentionally spoliated evidence, that their insurance claim was denied in good faith, and that their CUTPA/CUIPA claim is inappropriate because it improperly links Peerless' decision to deny the Belzes' claim with other "concrete decay" claims brought by different homeowners. Each of Peerless' arguments is addressed in turn below.

### A. Breach of Contract

The Belzes assert that the cracking damage in their basement walls amounts to a "collapse…caused by…[h]idden decay," which is a covered loss under the terms of the insurance policy. Mem. in Opp. 5, ECF No. 60; Exh. A at 58. Peerless, on the other hand, argues that the cracking in the basement walls constitutes a "[l]oss to a[] … foundation [or] retaining wall," which is explicitly excluded from coverage under the terms of the insurance policy. Mem. in Supp. 11, ECF No. 54; Exh. A at 58. The parties also dispute the timing of the claimed loss. The Belzes insist that they were not aware of the extensive cracking damage reported to Peerless until April 2013, when they removed the "brightwall" that had been blocking their basement walls from view since 2007. Mem. in Opp. at 1-2. Peerless, however, insists that the cracking damage in the Belzes' basement walls was first revealed to the Belzes in 2001, well before the commencement of the insurance policy at issue, which they argue further justifies the denial of the Belzes' insurance claim. Mem. in Supp. at 21-22.

Connecticut law has long stated that insurance policies are interpreted under the same rules that govern the construction of any written contract. *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372-373 (2009) (quoting *Conn. Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5-6 (2008)). "It is the function of the court to construe the provisions of the contract of insurance." *Bonito v. Cambridge Mut. Fire Ins. Co.,* 64 Conn. App. 487, 489 (2001) (citing *Gottesman v. Aetna Ins. Co.,* 177 Conn. 631, 634 (1979)). "If the words [of an insurance contract] are plain and unambiguous, they must be given their ordinary and natural meaning… If the language is ambiguous, however, the ambiguity must be resolved against the insurer." *Aetna Life & Cas. Co. v. Bulaong*, 218 Conn. 51, 60 (1991); *see also Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 38 (2014) ("any ambiguity in the terms of an insurance policy must be

construed in favor of the insured because the insurance company drafted the policy"). Peerless' various arguments with respect to the Belzes' breach of contract claim are examined in turn below.

1. Coverage under the "Collapse" Provisions of the Insurance Contract

Peerless argues that the terms "foundation" and "retaining wall" are unambiguously defined to include basement walls, thereby justifying the denial of coverage for the Belzes' basement walls under the exclusions governing foundations and retaining walls in the "Collapse" provision of the insurance policy. Mem. in Supp. at 11. The ambiguity of the contract terms at issue in this case has already been determined by this Court in a previous ruling in this matter, *Belz v. Peerless*, 46 F.Supp.3d 157 (D. Conn. 2014), at the Motion to Dismiss stage. After evaluating the differing interpretations of the terms "foundation" and "retaining wall" proposed by the parties, this Court rejected Peerless' argument, concluding that "the terms 'foundation' and 'retaining wall' are both ambiguous" and should be construed against Peerless. *Id*. at 164.

According to longstanding "law-of-the-case doctrine," "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) (internal citations omitted). Applying the Court's prior ruling to our present analysis of Peerless' Motion for Summary Judgment, the Court finds that the terms "foundation" and "retaining wall" are ambiguous and subject to multiple reasonable interpretations. Accordingly, these terms should be construed against Peerless, and the Belzes' basement walls should not be considered part of the property's "foundation" or "retaining wall" for purposes of insurance coverage.

This conclusion is confirmed by numerous decisions in recent insurance disputes interpreting identical policy language with respect to similar insurance claims. *See, e.g.*,

*Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 at *4 (D. Conn., Aug. 10, 2010) ("the term 'foundation,' as it is contained in the policy at issue in this case, is reasonably susceptible to more than one reading"); *Karas v. Liberty Ins. Co.*, 33 F.Supp.3d 110, 115 (D. Conn. 2014) ("Each party thus has a reasonable but different interpretation [of the terms 'foundation' and 'retaining wall']… so the phrases are ambiguous, and the insurance policy should be construed against [Defendant]"); *Gabriel v. Liberty Mutual Fire Insurance Company*, 2015 WL 5684063 at *4 (D. Conn., Sep. 28, 2015) ("This court is satisfied that it is capable of making a sound decision, in light of the applicable authorities, that the terms 'foundation' and 'retaining wall' are ambiguous in the context of the policy language at issue in this case").  Construing the ambiguous contract terms in favor of the insured party, the cracking damage to the Belzes' basement walls is not categorically excluded from coverage under the contract terms governing foundations and retaining walls.

Having concluded that the claimed loss is not categorically excluded under the policy terms, there remains a genuine issue of material fact as to whether the claimed loss constitutes "[h]idden decay" as required for coverage under the remainder of the "Collapse" provision of the insurance policy. Exh. A at 58.  The record includes evidence that the cracking damage resulted from hidden chemical reactions within the concrete itself.  Mem. in Opp. at 6; Exh. S at 2-4; Grandpré Dep. 19, 28-29, ECF No. 53-19 (Exh. P).  An evaluation of the basement walls conducted by engineer David Grandpré shortly after the Belzes' insurance claim was filed observes that the cracking damage resulted from chemical processes that were "hidden from view" and that the damage "compromised the structural integrity" of the Belzes' home.  Exh. S at 3-4.  The Connecticut Supreme Court has long held that the term "collapse" in homeowners' insurance policies may include "substantial impairment to the structural integrity of a building."

*Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 253 (1987); *see also Bacewicz*, 2010 WL 3023882 at *5; *Belz*, 46 F.Supp.3d at 163.  Viewing the facts in the light most favorable to the non-moving party, the cracking in the basement walls could reasonably be deemed a "collapse" resulting from "hidden decay" based on unseen chemical reactions within the concrete itself.  The question of whether the cracking in the basement walls actually resulted from "hidden decay" is a disputed question of fact that should be left to the trier of fact.

The parties have filed supplemental briefs further disputing the meaning of the terms "foundation," "retaining wall" and "collapse."  Pl. Br.,  ECF No. 71; Def. Br., ECF No. 72.  Specifically, the parties dispute whether the term "collapse" is sufficiently defined under Connecticut law.  *Id*.  Peerless recognizes that, under *Beach*, a "substantial impairment to structural integrity" could constitute a "collapse" for home insurance purposes; however, since the phrase "substantial impairment" has not been explicitly defined in Connecticut courts, Peerless urges this Court to adopt the definition articulated in a recent Washington Supreme Court decision, *Queen Ann Park Homeowners Ass'n v. State Farm Fire and Cas. Co.*, 352 P. 3d 790, 791 (Wash. 2015).

This ruling defines "substantial impairment" as requiring a showing that the cracks "impair[ed] a building's ability to remain upright."  *Queen Ann*, 352 P. 3d at 794.  Peerless argues that, under this *Queen Ann* standard, the Belzes have failed to establish a "substantial impairment" because their walls did not fall down and they were not forced to leave their home.  Def. Br. at 4-5, ECF No. 72.  Alternatively, Peerless requests that this Court certify to the Connecticut Supreme Court the question of how to define "substantial impairment."  *Id*. at 12-13.

The Court finds no reason to adopt Washington state law when the standard in Connecticut is relatively clear, nor is there a need for certifying this issue to the Connecticut Supreme Court. The Connecticut Supreme Court has already held that a "collapse" for home insurance purposes may include "substantial impairment to the structural integrity of a building." *Beach*, 205 Conn. at 253. The Belzes have presented evidence that the cracks in their basement walls compromised the structural integrity of their home. Exh. S at 3-4. Viewing the facts in the light most favorable to the plaintiffs, there is a material dispute as to whether the damage amounts to a "collapse" under the Peerless policy. Accordingly, the question of whether the damage was covered under the "collapse" provisions of the insurance policy cannot appropriately be resolved at the summary judgment stage and should be left for the jury.

### 2. Timely Notification and Suit

Peerless also maintains that denial was appropriate under the insurance policy based on the timing of the Belzes' claim. Mem. in Supp. at 21-30. Peerless cites to the "Policy Period" and "Suit against Us" provisions of the insurance policy,[1] arguing that the "collapse" of the Belzes' basement walls actually occurred closer to the time of purchase in 2001, before the property was insured by Peerless. *Id*. at 22-23. In support of its argument, Peerless cites to a deposition taken of engineer David Grandpré in a separate case, *Roberts v. Liberty Mutual Fire Insurance Company* (3:13-CV-00435 (SRU)), in which Mr. Grandpré discusses a different property that experienced similar cracking damage. *Id*.; Grandpré Dep., ECF No. 53-17 (Exh. Q). Peerless claims that, in light of the similarities between the home in *Roberts* and the Belzes' home, Mr. Grandpré's testimony about the progression of the "hidden decay" in the *Roberts* case

---

[1] These provisions set out the time limitations for filing an insurance claim with Peerless, stating as follows: "**Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss"; "**Policy Period.** This policy applies only to loss in Section I or 'bodily injury' or 'property damage' in Section II, which occurs during the policy period." Exh. A at 70.

suggests that the "hidden decay" alleged by the Belzes would have resulted in substantial structural impairment by 2001 or 2002, before the applicable insurance protections were in place. Mem. in Supp. at 23-24.

The reports prepared in connection with inspections of the Belzes' property, however, contradict this narrative. The Belzes point to two separate engineer reports, one completed by Mr. Mullan in 2001 and a second completed by Mr. Grandpré in 2013, to demonstrate that the cracks in their basement walls posed no recognizable threat to the structural integrity of their home until 2013. Mr. Mullan's report from 2001 states that, "[a]s numerous as these cracks are, they are not indicative of a major structural defect… In conclusion, the foundation walls are structurally sound." Exh. F at 2. Mr. Grandpré's report from 2013, on the other hand, states that "the concrete basement walls were substantially structurally impaired… The severe cracking suggests that portions of the concrete basement walls were approaching the point where the concrete was going to start falling to the ground." Exh. S at 4. As Peerless has noted, other than the testimony of the inspecting engineers and the testimony of the Belzes themselves, no photographic or other evidence has been provided to show the condition of the Belzes' basement walls before 2013. Mem. in Supp. at 21-22.

When deciding a motion for summary judgment, "the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal citations omitted). It is well-settled that the "burden [is] on the moving party to demonstrate the absence of any material fact issue genuinely in dispute." *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). Summary judgment is only proper where there is no genuine issue of material fact; in other words, where "no rational jury could find in favor of the

nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here, the evidence presented by the parties demonstrates that there is a genuine dispute about when the "collapse" of the Belzes' basement walls took place.  This issue of fact is material with respect to the question of whether the Belzes' claim is barred under the "Policy Period" provision, as it speaks directly to the applicability of the contract to the dispute at hand.[2] Peerless has not met its burden with respect to the timing of the alleged "collapse"; accordingly, any material issues involving this question are best left for the jury to decide at trial.

### 3. Neglect and Failure to Prevent Further Damage

Peerless also argues that coverage is precluded by the Belzes' own neglect and failure to mitigate damage.  Under the terms of the applicable insurance policy, any loss directly or indirectly caused by "neglect" is specifically excluded from coverage, meaning "neglect of the 'insured' to use all reasonable means to save and preserve property at and after the time of the

---

[2] Regardless of when the alleged "collapse" of the Belzes' basement walls actually took place, it is undisputed that the Belzes did not discover the severity of the cracking damage until the brightwall was removed in 2013, and the record contains ample evidence that the Belzes could not have reasonably discovered the damage before that time. Although there is no Connecticut Supreme Court authority on point, this Court has determined on multiple occasions that the "date of loss" for purposes of an insurance policy's "Suit Against Us" provision is the date on which the insured learned or should have learned of the covered loss. *Roberts v. Amica Mutual Insurance Company*, 2015 WL 7458510 at *3 (D. Conn., Nov. 24, 2015); *Bacewicz*, 2010 WL 3023882 at *7 (applying the "discovery rule" and concluding that "the limitations period begins to run only when a reasonable person would have learned of the injury or loss"); *see also Parker v. Worcerster Ins. Co.*, 247 F.3d 1, 4 (1st Cir. 2001) (predicting Connecticut law in a similar "concrete decay" insurance dispute and finding that "in the case of a non-obvious injury or loss, the [suit limitations] period begins to run only when a reasonable person would have learned of the injury or loss"). The exact timing of the "collapse," then, is immaterial with respect to the Belzes' compliance with the "Suit Against Us" provision of the policy; the real issue is whether the Belzes could have reasonably discovered the "collapse" before removing the brightwall in 2013.  The Belzes' claim was brought within weeks of discovering the loss, and the fact that the cracks were obscured from view from 2007-2013, combined with the early engineer's reports that the cracks did not threaten the structural integrity of the home, suggest that the Belzes could not have known of the "collapse" any sooner than 2013.  Drawing all inferences in favor of the non-moving party, a reasonable jury could find that the Belzes acted in compliance with the "Suit Against Us" provision of the policy.

loss." Exh. A at 62.  Peerless specifically asserts that the Belzes failed to monitor the cracks for changes, ignoring clear guidance recommending continued monitoring, and that the Belzes accelerated the damage by covering the cracks with brightwall from 2007 until 2013.  Mem. in Supp. at 25-26.

The policy terms governing neglect unequivocally state that the Belzes' duty was to use all "reasonable" means to preserve the property.  Exh. A at 62.  The Belzes point to several specific actions they took in response to the concerns raised in the initial 2001 home inspection by HQH, including hiring an independent engineer to evaluate the basement wall cracking, making repairs to the gutters and down spouts to prevent water damage through the cracks, and adopting the practice of using pumps during significant weather events.  Mem. in Opp. at 19, Exh. G at 37, 42.  The Belzes also argue that the installation of the brightwall was reasonable under the circumstances, given that the cracking damage in the basement walls had not visibly progressed from 2001 to 2007 and that at least two inspections from 2001 confirmed that the cracks did not threaten the structural integrity of their home.  Mem. in Opp. at 19-20.  The evidence suggests that the Belzes did take steps to protect and preserve the property after discovering the cracking in their basement walls, culminating in their decision to replace the walls entirely in order to prevent a more complete collapse in the future.  *Id*. at 18.

Peerless further argues that the deterioration of the basement walls was advanced by exposure to water, which the Belzes could have prevented by waterproofing their basement walls.  *Id*. at 28.  In support of this contention, Peerless presents a three-page report authored by concrete testing expert Nick Scaglione, in which he opines that "for the cracking distress to have reached the observed levels, a long term exposure to an exterior source of water was necessary" and suggests that the process could have been arrested had the Belzes treated their basement for

waterproofing. Scaglione Report 2, ECF No. 53-21 (Exh. U). This argument is directly contradicted by the report and testimony of Mr. Grandpré, who concludes that "[t]he concrete is essentially doomed from the day of conception" and that the claimed "collapse" would have inevitably resulted even if the only exposure to water was the water vapor from the air within the basement. Exh. P at 33-34. A trier of fact could reasonably conclude from this evidence that there is nothing more the Belzes could have done to prevent the collapse and replacement of their basement walls.

For the reasons outlined above, summary judgment with respect to the Belzes' Breach of Contract claim is denied.

### B. Breach of Covenant of Good Faith and Fair Dealing

In Count Two, the Belzes allege that Peerless breached the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 210 Conn. 150, 154 (1989). To constitute a breach of this duty, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433 (2004). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon*, 224 Conn. 231, 237 (1992) (internal citations omitted).

The Belzes contend that Peerless denied their insurance claim in bad faith, intentionally citing inapplicable portions of the insurance policy in its denial letter despite knowledge that the

cracking damage was caused by hidden decay and may have been covered under the policy on those grounds. In support of their contention, the Belzes show that there have been multiple separate lawsuits brought against either Peerless or Liberty Mutual Group (the family of insurance companies to which Peerless belongs) involving the same type of damage and identical policy language. Mem. in Opp. at 26-27. In each of these cases, evidence was provided to show that the cracking damage resulted from defective concrete supplied by the J.J. Mottes company. *Karas v. Liberty Ins. Corp.*, Connecticut Federal District Court Civil Action No. 3:13- cv-1836 (SRU); *Roberts v. Liberty Mutual Fire Insurance Company*, Connecticut Federal District Court Civil Action No. 3:13-cv-00435 (SRU); *Celentano v. Liberty Mutual Fire Insurance Co., et al*, Tolland Superior Court Docket No. TTD-CV-15-6009018-S; *see also Metsack v. Liberty Mutual Fire Insurance Co.*, Connecticut Federal District Court Civil Action No. 3:14-cv- 01150 (VLB); *Gabriel v. Liberty Mutual Fire Insurance Co.*, Connecticut Federal District Court Civil Action No. 3:14-cv- 01435 (VAB).

Peerless nonetheless argues that it did not know that the cracking damage reported by the Belzes could have been caused by hidden decay. Mem. in Supp. at 37. Peerless states that it was never informed by the Belzes that the claimed damage was a "collapse" potentially covered under the "Collapse" section of the policy. *Id.* However, it is the duty of the insurer, not the insured, to fully investigate insurance claims and determine coverage. Conn. Gen. Stat. § 38a-816(6)(d); *see also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 801 (2013) ("an insurer's failure to conduct an adequate investigation of a claim, when accompanied by other evidence, reflecting an improper motive, properly may be considered as evidence of bad faith" ) (internal marks and citations omitted).

There is evidence that Peerless acted reasonably in its investigation and denial of the Belzes' claim. Shortly after the claim was filed, Peerless dispatched an engineer to inspect the property, and the engineer's report concluded that the basement walls were structurally sound and made no indication that hidden decay was the cause of the cracking. Mem. in Supp. at 35; Monaco Report 3, ECF No. 53-12 (Exh. L). On the other hand, there is also evidence to support the contention that Peerless may have acted in bad faith in its investigation of the Belzes' claim. The deposition testimony of Michael Piacente, Senior Inside Loss Specialist for the defendant, suggests that it was Peerless' practice not to apply the "collapse" provision of the policy to a claimed loss where the impacted structure was still standing,[3] despite the long-standing principle under Connecticut case law that a "collapse" may be found even where a structure is still standing if the structural integrity is compromised. Dep. of Michael Piacente 103, ECF No. 53-22 (Exh. V); *Beach*, 205 Conn. at 253 (1987). Despite Peerless' insistence that it had no reason to consider the applicability of the "collapse" provision of the policy when evaluating the Belzes' claim, Peerless does not allege that it was unaware of the multiple "concrete decay" claims that had been brought against it by other homeowners at the time its decision was made.

Drawing all inferences in favor of the plaintiffs, a genuine factual dispute remains as to whether Peerless denied the Belzes' claim with knowledge that the claim was covered under the policy. This dispute is central to the Belzes' bad faith claim. Accordingly, Peerless' Motion for Summary Judgment with respect to Count Two of the Belzes' complaint is denied.

### C. Violation of CUIPA/CUTPA

---

[3] When asked whether "Peerless believes [the Belzes' basement walls were] not in a state of collapse," Peerless employee Michael Piacente replied, "Correct." When asked to clarify whether this belief was "[b]ecause [the walls were] still standing," he again confirmed by stating, "Correct." Exh. V at 103.

16

The Belzes' final claim alleges that Peerless engaged in an unfair business practice in violation of CUIPA and CUTPA.  The relevant provisions of CUIPA prohibit "unfair settlement practices," which must be demonstrated by a showing that "the defendant has committed the alleged proscribed act with sufficient frequency to indicate a general business practice."  Conn. Gen. Stat. 38a-816(6); *Karas*, 33 F. Supp. 3d at 117; *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 672 (1992).  When ruling on Peerless' Motion to Dismiss in this matter, this Court concluded that Peerless' refusal to cover similar claims in three separate matters was "sufficient to show that Peerless, as a member of the Liberty Mutual Group, has a general business practice of unfairly settling disputes in the particular circumstances present here."  *Belz*, 46 F. Supp. 3d 157, 167 (D. Conn. 2014).

Peerless has not provided evidence contradicting the Belzes' claim that Peerless has a practice of refusing to settle "concrete decay" claims without litigation.  In its summary judgment memorandum, Peerless argues that it "did not consider the outcome of [other] litigation in reaching its coverage determination."  Mem. in Supp. at 37-38.  However, the Belzes correctly note that "CUIPA requires proof of a general business practice, not the conscious consideration of similar claims when deciding to deny coverage."  Mem. in Opp. at 29; *Lees v. Middlesex Ins. Co.*, 229 Conn. 842, 847 (1994) (describing CUIPA's requirement of "proof that the unfair settlement practices were committed or performed with such frequency as to indicate a general business practice").  Drawing all inferences from the record as a whole in favor of the non-moving party, this Court finds enough evidence of a potential CUIPA/CUTPA violation to survive summary judgment.

## II. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **DENIED** on all counts.

SO ORDERED this 2nd day of September at Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE